**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| CYNTHIA ISABELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:18-cv-00364-DRL-MGG |
| | ) | |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY and TERESA | ) | |
| DOBRZYKOWSKI, individually and in | ) | |
| her official capacity as Assistant Dean of | ) | |
| IUSB College of Health Sciences, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Dr. Cynthia Isabell, respectfully submits the following memorandum of law in opposition to the motion for summary judgment filed by Defendants, The Trustees of Indiana University (the "University") and Dr. Teresa Dobrzykowski, in her individual and official capacities. [ECF Doc. 25.]

## I.    INTRODUCTION

Plaintiff has brought suit against Defendants alleging that she was unlawfully retaliated against based on her political and moral viewpoint regarding abortion. Plaintiff's suit is premised on federal and state causes of action, specifically, violation of the free speech clause of the First Amendment (Count I), violation of the Indiana Conscience Statute (Count II), and violation Article I, Sec. 9 of the Indiana Constitution (Count III). [ECF Doc. 1 at 6-7.]

In response to Defendants' Motion for Summary Judgment, Plaintiff presses only the two following claims: (1) Plaintiff's First Amendment claim against Dobrzykowski in her individual capacity (Count I), and (2) Plaintiff's Indiana Conscience Statute against the University (Count

II).[1]

As explained herein, because sovereign immunity does not protect Dobrzykowski in her individual capacity, and because Plaintiff's First Amendment claim is steeped in genuine issues of material fact that only a jury can resolve, Dobrzykowski is not entitled to summary judgment. Also, Dobrzykowski is not entitled to qualified immunity.

With respect to Dr. Isabell's state conscience claim under Ind. Code § 16-34-1-6, because Defendants waived the affirmative defense of lack of notice under the Indiana Tort Claims Act, by not raising it in their answer to the complaint, that claim cannot be dismissed on those grounds. As with Plaintiff's §1983 individual capacity claim against Dobrzykowski, genuine issues of fact preclude summary judgment based on that state claim.

## II.     STATEMENT OF GENUINE DISPUTES

Pursuant to L.R. 56-1(b)(2), Plaintiff has set forth her Statement of Genuine Disputes in Appendix A. The Appendix of Materials in Opposition to Defendants' Motion for Summary Judgment are set forth in Appendix B.

## III.    SUMMARY JUDGMENT STANDARD

In adjudging the instant motion, this Court must review the record in the light "most favorable" to Isabell and draw "all reasonable inferences" in her favor. *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015). Defendants "must show that the evidence . . . is so one-sided that . . . [they] must prevail as a matter of law." *William Bodemer & Innovative Bev. v. Swanel Bev.*, 884 F. Supp. 2d 717, 737 (N.D. Ind. 2012) (citation omitted). Importantly, in deciding whether Defendants have carried that heavy burden, this Court "may not make

---

[1]  Plaintiff thus concedes the following claims: (1) the First Amendment claim against the University; (2) the First Amendment claim against Dobrzykowski in her official capacity; (3) the Indiana Conscience Statute claim against Dobrzykowski; and (4) the Indiana state constitutional claim against the University and Dobrzykowski.

credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* at 722 (citation omitted). Credibility of witnesses can only be assessed at trial. *Deets v. Massman Constr.* Co., 811 F.3d 978, 982 (7th Cir. 2016) (noting that "credibility determination[s] may not be resolved at summary judgment."). Where a determination of the credibility of witnesses is essential to resolving an issue of material fact, summary judgment is properly denied. *Spreen v. Brey*, 961 F. 2d 109, 111 (7th Cir. 1992). *See also Estate of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.")).

In a First Amendment retaliation context—such as here—the Seventh Circuit has cautioned that "[i]t is rarely appropriate on summary judgment for a district court to make a finding on state of mind." *McGreal v. Ostrov*, 368 F.3d 657, 677 (7th Cir. 2004) (citing *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001)). "Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985). *See also Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) ("in the First Amendment context, a defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury.") (citation omitted).

As explained and argued herein, there exist genuine issues of disputed material fact that preclude an award of summary judgment to Dobrzykowski in her individual capacity on Count I (free speech). Moreover, summary judgment should be denied the University on Count II (Indiana Conscience Statute).

IV.    **ARGUMENT**

    **A.**    **Dr. Dobrzykowski is not Protected by the Eleventh Amendment in her Individual Capacity.**

Defendants maintain that Isabell's claim against Dobrzykowski in her individual capacity is barred by the Eleventh Amendment. Def. Br. at 13-14. Defendants argue that because Isabell hasn't alleged "a single claim against Dobrzykowski for conduct taken by her individually as a person, separate and distinct from" her official role(s) at IUSB, Isabell's individual capacity claim against Dobrzykowski is, "in reality," an official capacity claim. *Id*.

Defendants are wrong. The notion that an individual acting within the scope of his authority as a state official gives rise only to an official capacity suit was repudiated long ago by the Supreme Court in *Hafer v. Melo*, 502 U.S. 21, 27 (1991) (explicitly rejecting the argument that "§ 1983 liability turns not on the capacity in which state officials are sued, but on the capacity in which they acted when injuring the plaintiff."). Indeed, it is black-letter law that "the difference between an official-capacity and an individual-capacity suit rests not on the capacity in which the defendant acted when injuring the plaintiff, but on the capacity in which the defendant is sued." *Thomas v. Sheahan*, 370 F. Supp. 2d 704, 709 (N.D. Ill. 2005) (citing *Hafer*, 502 U.S. at 27-28). *See also Rudd v. City of Norton Shores*, No. 1:18-CV-124, 2018 U.S. Dist. LEXIS 133746, at *12 n.4 (W.D. Mich. Aug. 8, 2018) ("the United States Supreme Court [has] put to rest the notion that a state actor's conduct within the scope of his authority as a state official gives rise only to an official capacity suit.") (citing *Hafer*); *Zuccaro v. Martinez Unified Sch. Dist*., No. 16-cv-02709-EDL, 2016 U.S. Dist. LEXIS 192532, at *20 (N.D. Cal. Sep. 27, 2016) (rejecting the argument, based on *Hafer*, that because the defendant "was acting within the

scope of his employment, he can *only* be liable in an official capacity.") (emphasis in original).[2]

"[T]o establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis in original). *See also Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991) ("in a suit where the complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies"); *Bull v. Bd. of Trs. of Ball State Univ.*, No. 1:10-cv-00878-JMS-TAB, 2012 U.S. Dist. LEXIS 61342, at *21 (S.D. Ind. May 2, 2012) ("Where a plaintiff alleges . . . tortious conduct of individuals acting under color of state law, the defendants have been sued in their individual capacities.").

Simply stated: "Where the plaintiff seeks injunctive relief from official policies or customs, the defendant has been sued in her official capacity; where the plaintiff alleges tortious conduct of an individual acting under color of state law, the defendant has been sued in her individual capacity." *Miller v. Smith*, 220 F.3d 491, 494 (7th Cir. 2000).

Because Plaintiff's Complaint clearly (1) names and sues Dobrzykowski in her individual capacity; (2) alleges that Dobrzykowski "act[ed] under the color of state law" in "violat[ing] Plaintiff's clearly established statutory and constitutional rights," and (3) requests compensatory and punitive damages against Dobrzykowski in her individual capacity, Isabell's claim against Dobrzykowski is "in reality" what the Complaint says it is: an individual capacity claim. [ECF Doc. 1 at 1, 6, and 7.]

Defendants, moreover, have not demonstrated that Isabell's individual capacity claim

---

[2] For these reasons, the suggestion in *Wade v. Ind. Univ. Sch. of Med.*, No. 1:16-cv-02256-TWP-MJD, 2019 U.S. Dist. LEXIS 116115 (S.D. Ind. July 12, 2019) (*not* a decision of this Court, as Defendants incorrectly state, Def. Br. at 13) that claims against individual state employees are not "bona fide individual capacity suit[s]" where the claims arise from the individuals' "conduct in their official capacities as employees of an arm of the state," is inexact, if not incorrect.

against Dobrzykowski has "the identical effect as a suit against the state." Def. Br. 13 (quoting *Haynes v. Ind. Univ*., 902 F.3d 724, 732 (7th Cir. 2018).

In *Reinebold v. Indiana University*, No. 3:18-CV-525-JD, 2019 U.S. Dist. LEXIS 71367 (N.D. Ind. April 25, 2019), two individual defendants and employees of IUSB—the school's athletic director and assistant athletic director, who allegedly passed over plaintiff based on solely on his age—asserted that the Eleventh Amendment barred plaintiff's § 1983 individual capacity claims against them.

This Court rejected the individual defendants' sovereign immunity defense in *Reinebold* for one essential reason: nothing indicated that a judgment in the plaintiff's favor would "flow from the state treasury," instead of from the defendants sued in their individual capacities. *Id*. at *6. The same holds true here. As in *Reinebold*, (1) Isabell "seeks to recover compensatory and punitive damages against [Dobrzykowski] for [her] alleged wrongdoing," *id*. at *3; (2) "nothing in the complaint limits [Isabell's] claim for compensatory damages to out-of-pocket losses," *id*. at *6; and (3) Isabell "seeks not only compensatory damages, but punitive damages against [Dobrzykowski] as well." *Id*. at *7. *See also Calautti v. Shanahan*, No. 1:18-cv-00119-TWP, 2019 U.S. Dist. LEXIS 132034 (S.D. Ind. Aug. 7, 2019) (relying on *Reinebold* in rejecting motion to dismiss § 1983 individual capacity claims based on Eleventh Amendment immunity).

Unlike in the Seventh Circuit cases cited by Defendants, Def. Br. at 13-14, and previously distinguished by this Court in *Reinebold*, Plaintiff is not seeking to enforce an employment contract to which the defendants were not signatories in their individual capacity. *See Haynes*, 902 F.3d at 732; *Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003). *See also Doe v. Purdue Univ*., No. 4:18-CV-89-JEM, 2019 U.S. Dist. LEXIS 49926, at *8 (N.D. Ind. Mar. 25, 2019) ("Plaintiffs are alleging constitutional violations by the individuals, not violations

of a contract to which the individuals were not parties."). Rather, Isabell is seeking to hold accountable the very individual who thwarted her chances for employment at IUSB based on her constitutionally protected viewpoint. Whether IUSB chooses to indemnify Dobrzykowski for her unconstitutional conduct "is irrelevant for sovereign immunity purposes." *Reinebold* at *4 n.2.

In sum, Isabell's individual capacity claim against Defendant Dobrzykowski is substantiated by law and fact, and the Eleventh Amendment does not bar it.

**B.**     **Disputed Issues of Material Fact Preclude Summary Judgment on Plaintiff's First Amendment Claim Against Dr. Dobrzykowski in her Individual Capacity.**

In the public employment context, a § 1983 claim for retaliation in violation of First Amendment rights involves a three-part analysis: (1) whether the speech is "constitutionally protected"; (2) whether the speech was a "substantial or motivating factor in the retaliatory action"; (3) whether, as a defendant must show, the "same action would have been taken in the absence of the employee's protected speech." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004) (citations omitted). In addition, a First Amendment retaliation claim "does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964." *Id.* at 941.

Moreover, it should be noted that, at the summary judgment stage, Isabell *need only show* her speech was a "motivating factor"—not a "but-for cause"—of Dobrzykowski's deprivation of her federally protected right. *See Foster v. Adams*, 489 Fed. Appx. 959, 961 (7th Cir. 2012) ("in presenting a prima facie case of First Amendment retaliation at summary judgment, the plaintiff need only show evidence that his speech was a 'motivating factor,' rather than the 'but for' cause, of an adverse employment action") (citing *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011)). *See also Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (holding that the "but

for" rule is inapplicable to First Amendment cases and that such cases are controlled by the Supreme Court's decision in *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274 (1977)); *Anderson v. Iacullo*, 963 F. Supp. 2d 818, 830 (N.D. Ill. 2013) (noting, in a First Amendment retaliation case, the plaintiff "need[ed] only show that his speech was a 'motivating factor,' not a 'but-for cause,' of an adverse employment action").

In addition, to the extent Defendants argue that Dobrzykowski cannot be individually liable because she was not the ultimate decision-maker in IUSB's decision to hire Angela Gatto instead of Isabell, that argument is unavailing. It is firmly established that "subordinate governmental employees with unlawful motives" can be individually liable under § 1983 based on the "cat's paw" theory of liability. *Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012). Such "individual liability under § 1983 is appropriate where the 'individual defendant caused or participated in a constitutional deprivation.'" *Hildebrandt v. Illinois Dep't of Natural Resources*, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)).

As the Fifth Circuit has stated (cited with approval in *Bray*, 681 F.3d at 898-99), upholding individual liability under § 1983 of college president who recommended discharge of faculty employees in retaliation for First Amendment activity: "It is not necessary that the improper motive be the final link in the chain of causation: if an improper motive sets in motion the events that lead to termination that would not otherwise occur, intermediate step[s] in the chain of causation do not necessarily defeat the plaintiff's claim." *Professional Ass'n of Coll. Educators v. El Paso County Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984).

## 1. *Disputed Issues of Material Fact Regarding Dobrzykowski's Knowledge and Motivating Factor Preclude Summary Judgment.*

Whether Dobrzykowski knew of Isabell's viewpoint on abortion, and whether Dobrzykowski retaliated against Isabell, poses a classic question of fact that only a jury can

decide—not this Court in ruling upon a motion for summary judgment.[3] A party opposing a motion for summary judgment need not have a smoking gun to defeat such a motion. "Admissions of illegal discrimination and retaliation are rare, so it is not surprising that [the plaintiff] has not presented a 'smoking gun' confession." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). If Isabell had irrefutable evidence that Dobrzykowski retaliated against her based on her pro-life beliefs, as Defendants seem to demand, Isabell would be the party moving for summary judgment.

While Dobrzykowski has not outright admitted that she knew of Isabell's viewpoint on abortion and retaliated against Isabell based on her viewpoint, Dobrzykowski's own words and conduct, as described by other members of the search and screen committee, presents a "convincing mosaic of circumstantial evidence . . . that, when taken as a whole and viewed in a light favorable to [her] case, could convince a reasonable jury that [Isabell] was the victim of unlawful retaliation." *Id*. at 643.

Plaintiff's Statement of Genuine Disputes paints such a convincing mosaic.

First, and amazingly, Defendants say nary a word about two members of the search and screen committee—Joyce Palmateer and Barbara White—who were adamant that Dobrzykowski's line of questioning was not an innocent or innocuous question about science and teaching, but about something else entirely: *abortion* (the subject, of course, of Isabell's Article). Palmateer was compelled to interject herself into Dobrzykowski's questioning by exclaiming, "Abortion isn't an issue. This is a mother baby unit. They've had the baby." [Exhibit 3 at 30:10-14.]

Dobrzykowski's silence in the face of Palmateer's objection during the interview speaks

---

[3] Defendants do not dispute that Isabell's Article is constitutionally protected speech.

volumes. [*Id.* at 31:2-13.] It is difficult to imagine an interviewer allowing one of her fellow interviewers to think she was grilling a job applicant about such an inappropriate or controversial issue—an issue that potentially implicates an interviewee's religious beliefs—without immediately acting to dispel the notion. Palmateer was so certain about the gist of Dobrzykowski's questions that she later expressed to a friend her fear that "my view on life could be a reason I could or couldn't get a job." [*Id.* at 43:3-44:14.]

Similarly, if there's one thing committee member Barbara White remembers about Dobrzykowski's line of questioning at Isabell's interview, it's "the question about being pro life." [Exhibit 4 at 29:9-16.] In fact, according to White, even members of the faculty who were not present on the search and screen committee heard about Dobrzykowski's "pro-life" question—and they were "appalled." [*Id.* at 37:18–24.]

When the testimony of Palmateer and White regarding the interview—substantiated in more detail in Plaintiff's Statement of Genuine Dispute—are coupled with Dobrzykowski's statement, that she became aware of the Article "at the time of the interview," [Exhibit 1 at 87:18-23], it is difficult to explain Dobrzykowski's questioning of Isabell without concluding that she had read or was aware of the Article. Indeed, a reasonable juror could very well conclude that, in light of Palmateer and White's deposition testimony—two individuals who don't have a proverbial dog in this fight—that Dobrzykowski is *lying* when she testified that she hadn't read the Article or asked Isabell about abortion during the interview. [Exhibit 1 at 40:19-21; 87:14-15.]

Given the fact that, as Defendants point out, Isabell had not shared either the Article or her opinion about abortion with anyone at IUSB prior to her interview in January 2017, the fact that Dobrzykowski asked her "about being pro-life"—according to White's firm recollection—

and asked her a question that more or less tracked the thesis of the Article, strongly indicates that Dobrzykowski had read or was at least aware of the Article and the viewpoint expressed in it. In fact, the reaction of not only Isabell and Palmateer, but also that of White—who filed a complaint with IUSB's Affirmative Action Office over it (discussed *infra*)—and other faculty members who heard it, is hard to fathom if—as Defendants would have it—Dobrzykowski had merely by chance asked an innocuous question about science and nursing to someone who was, perhaps, hypersensitive about it. Put another way, if Dobrzykowski, with close to thirty years of clinical appointments with the country's largest abortion provider—Planned Parenthood—just accidentally or coincidentally happened to ask a job applicant who had recently published an internet article about being pro-life, *about being pro-life*, then Dobrzykowski is truly, to paraphrase Lou Gehrig, the unluckiest woman on the face of the earth. [Exhibit 9 at 1; Exhibit 1 at 154:5-7.]

In sum, a jury could draw the reasonable inference, based on testimony set forth in the record, that Dobrzykowski, in fact, "knew of [Isabell's] protected speech." Def. Br. at 17 (quoting *McGreal v. Village of Orland Park*, 850 F.3d 308, 313 (7th Cir. 2017)).

As to whether Isabell's speech was a motivating factor behind Dobrzykowski's rigging of the application process against Isabell, the record, set forth in Plaintiff's Statement of Genuine Disputes, more than supports that conclusion.

First—and again, nowhere addressed by Defendants—every member of the search and screen committee, other than of course Dobrzykowski herself, testified about the highly improper fashion in which Dobrzykowski conducted the entire interview process. *See Kidwell*, 679 F.3d at 969 (noting that an abandonment of hiring policies is circumstantial evidence of a retaliatory motive) (citation omitted); *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992)

(noting that a jury could reasonably have concluded that failure to adhere to procedures was circumstantial evidence of retaliation).

According to White, "the committee members were not satisfied with the process, knew that steps had been missed that . . .  should not have been missed in the process." [Exhibit 4 at 37:5-10.] White even went so far as to file a complaint with IUSB's Affirmative Action Office over the way in which Dobrzykowski handled the interviews. [*Id*. at 54:17-23.] She complained that it was "not uniform and did not follow campus policy." [*Id*. at 55:5-6.] Indeed, White thought that Dobrzykowski's "inappropriate question" has "made us legally vulnerable." [*Id*. at 55:7-8.]

Similarly, according to Palmateer, there was a lack of uniformity between the interviews/teaching presentations of the two candidates. Dobrzykowski did not ask Gatto a question similar to the one she asked Isabell about "controversial" issues. [Exhibit 3 at 32:1-19.] The entire set up of the Isabell and Gatto interviews were bedeviled with "inconsistencies." [*Id*. at 62:11-63:1; 67:24-68:15.] Palmateer, moreover, was never asked by Dobrzykowski whom she thought would be the better candidate. [Exhibit 3 at 68:25-70:5.]

LaLime, an acquaintance of Gatto and former classmate, agreed with Palmateer that something was not "right" about the interviews and that the process was not entirely "uniform." [Exhibit 5 at 13:1-10; 33:13-34:2.] LaLime recalls that when Dobrzykowski asked Isabell something along the lines of science and controversy, she thought that the question seemed "odd," off script, and that Dobrzykowski's demeanor in asking the question was, "off-putting." [*Id*. at 30:24-31:7.]

In sum, disputed material facts abound on this critical point, turning on basic credibility issues. While Dobrzykowski claims she "absolutely" did not ask Isabell questions regarding pro-

life issues, [Exhibit 1 at 40:21], White testified directly to the contrary. [Exhibit 4 at 29:9-16.] Moreover, while Dobrzykowski claims she asked a variant of her "controversial topics" question to both Isabell and Gatto, [Exhibit 1 at 36:14-37:15], Gatto testified directly to the contrary. [Exhibit 8 at 22:9-18.] *No one*, including Dobrzykowski, asked Gatto questions about how she would teach or introduce a controversial topic to students. [*Id*.]

According to Dean Clark, however, "[t]here should be a standard set of questions asked of each applicant." [Exhibit 6 at 16:17-19.] Asking the same questions allows for "consisten[t] information for comparison." [*Id*. at 17:3.] Indeed, IUSB policies for search and screen committees require that information be gathered in a "uniform manner" from candidates and that interviewers ask the "same question." [Exhibit 7 at 1-2.] The policies themselves explain why such uniformity is necessary: "Asking *different* questions of each candidate *leads to a skewed assessment* of who would best perform the job." [*Id*. (emphasis added.)]

In light of the foregoing, there are obvious genuine issues of material fact with respect to Dobrzykowski's knowledge of Isabell's pro-life viewpoint and whether, based on that viewpoint, Dobrzykowski unlawfully retaliated against Isabell by skewing the application process against her.

Finally, Defendants' blanket assertion that it is undisputed that Dobrzykowski is "pro-life," is, in fact, very much contested. Def. Br. at 2. Barbara White testified that she believes Dobrzykowski is "pro choice." [Exhibit 4 at 93:23-25.] And Isabell testified that she was in the presence of Dobrzykowski when she disparaged a doctor for being "prolife." [Exhibit 2 at 35:13-37:9.]

In addition, there is no denying what Dobrzykowski's own curriculum vitae states, *i.e.*, that she held various positions with Planned Parenthood for close to twenty-five years [Exhibit 9

at 1], and still does perhaps to this day. [Exhibit 10.]

While a public employee can certainly be pro-choice and adhere to the First Amendment in not unconstitutionally retaliating against others for their pro-life beliefs (and vice versa), here, the "question about being pro-life" was, according to White, coupled with a question about "whether or not she would be able to teach." [Exhibit 4 at 29:9-16.] This shows that in Dobrzykowski's mind, "being pro-life" was a mark against a candidate, a clear indication of discriminatory animus. This is buttressed by considering Palmateer's interjection about Dobrzykowski questioning Isabell about abortion during the interview and Dobrzykowski's silence in the face of it. [Exhibit 3 at 31:2-13.] Palmateer's whole point was that abortion was not an issue that came into play in the job for which Isabell was interviewing. That Dobrzykowski failed to correct Palmateer about her understanding of what Dobrzykowski was asking strongly implies that Dobrzykowski disagreed. In other words, Dobrzykowski did think that "being pro-life" was reason enough to disqualify Isabell. Thus, when Dobrzykowski's longstanding association with and commitment to the leading pro-choice organization in the country is coupled with her words and actions during the 2017 hiring process, an inference of discriminatory animus against Isabell because of her opposing viewpoint is more than reasonable.

The foregoing facts provide ample support that Dobrzykowski had knowledge of Isabell's Article and her pro-life viewpoint. They also support the conclusion that Isabell's speech was the motivating factor behind Dobrzykowski's retaliatory actions—actions that poisoned the entire application process, leading to Isabell being denied a position at IUSB. It simply cannot be said, as Defendants state, that "Dr. Isabell's free speech claims amount to nothing more than her own unsupported speculation." Def. Br. at 20.

**2.      *Disputed Issues of Material Fact Regarding Defendants' Same Decision Defense Preclude Summary Judgment.***

Defendants argue that, even assuming Isabell's "viewpoint on abortion and her expression of that viewpoint were motivating factors in the ultimate decision not to hire her," it does not matter because, as a matter of law, the same recommendation and decision would have been made anyway. Def. Br. at 20. It is Defendants' burden at this stage to show that there exists no genuine dispute of fact on this issue. *See Ramos v. Pabey*, 628 F. Supp. 2d 895, 901 (N.D. Ind. 2007) (addressing burden-shifting in First Amendment retaliation claims) (citing *Mt. Healthy* and *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004)). Defendants must therefore "show that the evidence on the question is so one-sided that no reasonable jury could find for the party opposing the motion." *Id*. at 901-2 (citation omitted).

Based on Plaintiff's Statement of Genuine Disputes, Defendants cannot possibly meet this burden.

To begin with, Defendants are simply incorrect when they assert that "each one of the search and screen committee members thought that Ms. Gatto, based solely on her performance during the hiring process, was the better candidate for the CAP position." Def. Br. at 21. On the contrary, Joyce Palmateer believed that the hiring process—from which Dobrzykowski excluded her after she challenged Dobrzykowski during Isabell's interview—was incomplete, that she had not, in fact, made up her mind between Gatto and Isabell. [Exhibit 3 at 68:25-70:5.] Palmateer "wanted to have a thoughtful conversation with my colleagues about what they thought . . . we should have discussed it . . ." [*Id*.]

That sort of "thoughtful conversation" never happened. Palmateer's opinion was never sought by Dobrzykowski, despite Dean Clark's "expectation" that every committee member should have "the opportunity to contribute to the recommendation." [Exhibit 6 at 19:8-10.]

15

While it is true that the other two members of the committee—White and LaLime—testified that they agreed that Gatto was the superior candidate, it is telling that their assessment of Gatto's alleged superiority to Isabell was based largely on the differences between the two candidates' performances at the interviews and teaching presentations. In other words, Isabell—after being knocked off her balance by Dobrzykowski's questioning regarding her beliefs about abortion (a question White and others found appalling and perhaps, as White said, made the school legally vulnerable)—gave a less impressive performance than did Gatto for whom, we are told by those present at the interview, Dobrzykowski did not treat similarly to Plaintiff. Unequal treatment in the beginning inevitably leads to an unequal result in the end. As IUSB polices recognize, "[a]sking different questions of each candidate leads to a skewed assessment of who would best perform the job." [Exhibit 7 at 1-2.] And that is exactly what has happened here. Dobrzykowski's skewing of the process against Isabell at her interview skewed everything that came after, including the final recommendation and decision. One cannot very well break the knee of a horse at the start of a race and exclaim at the end of the race that the best horse won.

Even White herself, who stated that she believes "in my soul that we made the right decision," also said—based on the lack of uniformity during the process—"I can't say *whether* [*i.e.*, not "that"] the wrong decision was made based on the interview process." [Exhibit 4 at 52:2-7 (emphasis added).]

Isabell testified that, once Dobrzykowski began inquiring about what she took to be her abortion stance during the interview (an inquiry LaLime found "off-putting"), her entire performance during both the interview and teaching presentation phases of the process went markedly downhill. [Exhibit 2 at 75:5-10.] In other words, Dobrzykowski's "off-putting" questioning succeeded in putting Isabell off her game. And it's therefore no wonder that Isabell

says that, during the post-interview teaching presentation to the faculty, she "felt totally out of sync with what I was doing"—as well as "very uncomfortable," and "very anxious." [Exhibit 2 at 75:24-76:10.]

Thus, to the extent that the "same-decision" analysis in this case depends on the respective interview/teaching presentation performances of the two candidates, the record is clear, as described in Plaintiff's Statement of Genuine Issues, that those performances were deliberately and intentionally rigged by Dobrzykowski against the candidate for whom she harbored a discriminatory animus. That neither White (for whom it was bad enough to merit an Affirmative Action complaint) nor LaLime (Gatto's former classmate and acquaintance) took into account the effect on Isabell's performance of Dobrzykowski's manipulation of the process is unfortunate. But it does nothing to help Defendants carry their burden at the summary judgment stage on the same-decision issue.

Moreover, it is telling that Isabell's admittedly subpar performance (*after* being subjected to Dobrzykowski's mistreatment), as evidenced in some of the evaluations of her audience, stands in stark contrast to the evaluations she received from her students for her classroom and clinical work during the previous semester. [Exhibit 11, Student Evaluations for Fall Semester 2016.] There, Isabell received rankings and grades that show her consistently *superior to those received by other faculty members in the IUSB Nursing Department*. The difference? In the one setting, she was teaching as a respected member of the IUSB staff with many years teaching experience; in the other, she perceived herself to be under the gun for having had the temerity to express her viewpoint on a highly controversial issue. The cause of that difference? Defendant Dobrzykowski.

Finally, it is undisputed that one person who had no knowledge of Dobrzykowski's

Affirmative-Action-complaint-worthy treatment of Isabell and her rigging of the hiring process was Dean Clark. True, Clark did call Dobrzykowski to task for presenting her with an incomplete, one-sided recommendation that failed to say anything at all about Isabell. [Exhibit 6 at 74:14-75:2.] But there is no indication that Dobrzykowski, or anyone else, told Clark, before she either ratified or made the hiring decision, that Dobrzykowski's questions and actions at Isabell's interview left committee members and outside faculty "appalled" and "upset" by her treatment of Isabell. To the extent, therefore, that Defendants seek to insulate Dobrzykowski from liability (the "monkey," under a cat's paw theory of liability), through Clark (the "hapless cat"), that effort is unavailing. *See Neal v. AccuGear, Inc*., No. 1:14-cv-00395-PPS-SLC, 2015 U.S. Dist. LEXIS 98771, at *8 (N.D. Ind. July 29, 2015) (quoting *Bray*, 681 F.3d at 899).

Defendants cannot obtain judgment as a matter of law that they would have reached the same decision in this case because there are, as explained, genuine issues of disputed material fact that Dobrzykowski deliberately manipulated and skewed that process from the very start. *Cf. Nichols v. Ill. DOT*, 152 F. Supp. 3d 1106, 1132 (N.D. Ill. 2016) (citation omitted) ("It is not necessary that the actual termination decision be motivated by discriminatory animus. If the decision making process is tainted by discrimination, the claimant is entitled to relief."); *Alexander v. Wisconsin Dep't of Health and Family Services*, 263 F.3d 673, 684 (7th Cir. 2001) (summary judgment is generally inappropriate where plaintiff can show that employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action); *Bickerstaff v. Vassar Coll*., 196 F.3d 435, 450 (2d Cir. 1999) ("impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a

meaningful role in the . . . process.").

### 3. Disputed Issues of Material Fact Regarding Pretext Preclude Summary Judgment.

The Seventh Circuit is clear: a plaintiff need not "proffer different or additional evidence to rebut pretext from that she used to establish her prima facie case." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 673 (7th Cir. 2009). Indeed, "the same evidence used to establish the prima facie case is sufficient to allow a jury to determine that a defendant's stated reason for [an adverse employment action] was a mere front for an ulterior, unlawful motive." *Id.*

Assuming *arguendo* that the burden shifts back to Isabell to show pretext, *see Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 295 (6th Cir. 2012) ("[u]nlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims"), here, reading the facts in a light most favorable to Isabell, Clark's decision to hire Gatto over Isabell was *not* premised on a fair or uniform process—as every member of the search and screen committee (other than Dobrzykowski) has testified.[4] Instead, that process was infected from the start by Dobrzykowski's questioning of Isabell, according to White, on the "pro life" issue—a question, or even a similar one, that was not asked of Gatto. That questioning understandably threw Isabell off and negatively impacted her what she said and did thereafter.

In addition, Dobrzykowski's email to Clark, stating, on behalf of the committee, that "we recommend Angela Gatto," is simply untrue. [Exhibit 12.] As explained, Palmateer was left out of any discussion or dialogue about whom to recommend. And the first Palmateer learned that the committee was recommending Gatto for the Clinical Assistant Professor of Nursing position

---

[4] Neither *Mt. Healthy* nor *Spiegla* shift the burden back to Plaintiff to address pretext after a same-decision analysis. Neither does Seventh Circuit Jury Instruction, 6.01 ("Public Employee's First Amendment Free Speech Retaliation Claim").

was when she received a copy of Dobrzykowski's email to Dean Clark saying so. [*Id.* at 36:21-39:4.]

In addition, LaLime herself testified that the committee never formally met to come up with a recommendation or to discuss the pros and cons of Isabell and Gatto. [Exhibit 5 at 41:12-17.]

Moreover, as explained, Defendants are similarly wrong when they state, "it is undisputed that each individual at IUSB who participated in the interviews of Dr. Isabell and Ms. Gatto judged Ms. Gatto as the superior candidate for the CAP Position." Def. Br. at 23. While Palmateer stated she thought Gatto gave a better "presentation" than Isabell, Def. Br. at 9, Defendants do not acknowledge Palmateer's statement that, "there were some things where I thought Angela did better, and there were some things that I thought made Cynthia the better candidate. I just -- I don't know." [Exhibit 3 at 70:2-5.]

While Clark spoke with each of the candidates, and reviewed their curriculum vitaes, she also relied on the strengths and weaknesses table typed out by Dobrzykowski. [Exhibit 1 at 105:9-16; Exhibit 6 at 76:23-77:1.] But those who helped prepare that document are the very same ones who decried the unfair manner in which Isabell was treated, a treatment that led to Isabell's less-than-perfect performance for the rest of the application process.

In short, a reasonable juror could readily conclude that Clark's decision was premised on a falsehood—a falsehood created as a result of Dobrzykowski's machinations to debilitate Isabell by disparately treating her through her "appalling" inquiries. *See Russell v. Bd. of Trustees of Univ. of Illinois at Chicago*, 243 F.3d 336, 342 (7th Cir. 2001) (decision-making process tainted by supervisor's improper motives because of supervisor's active involvement in process was sufficient evidence of pretext to survive summary judgment).

It goes without saying that this Court does "not sit as an academic review board." Def. Br. at 23. But neither does it "abandon good reason and common sense in assessing an employer's actions." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).

### C. Disputed Issues of Material Fact Preclude Qualified Immunity for Dobrzykowski.

Defendants claims that Dr. Dobrzykowski is entitled to qualified immunity. Defendants are wrong.

Adjudicating an assertion of qualified immunity involves a consideration of two factors: "(1) whether a constitutional right was violated using *plaintiff's version of the facts*, and (2) whether that right was clearly established at the time." *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011) (citations omitted) (emphasis added). *See also White v. Pauly*, 137 S. Ct. 548, 551 (2017) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (citation omitted) (internal quotation marks omitted).

Dobrzykowski does not argue that the right to be free from retaliation for exercising one's First Amendment rights is not clearly established. Nor can she. It is undeniably constitutionally verboten for an individual acting under color of law to retaliate against another based on that person's speech on a matter of public concern. *See Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 789-79 (7th Cir. 2016) (citing decisions that the right to be free from retaliation for exercising one's First Amendment rights is clearly established); *Delgado v. Jones*, 282 F.3d 511, 520 (7th Cir. 2002) ("It has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights") (citation omitted); *Koch-Weser v. Bd. of Educ.*, Case No. 98 C 5157, 2001 U.S. Dist. LEXIS 14044, at *15-16 (N.D. Ill. Sep. 6, 2001) ("A reasonable person would have known

that such retaliation against an employee for expressing his opinions clearly violates that employee's First Amendment rights.").[5]

Rather, Defendants assert that "there is no evidence that Dr. Dobrzykowski violated a clearly established freedom of speech right of Dr. Isabell." Def. Br. at 15-16.

As explained *supra*, however, there are plentiful genuine issues of disputed material fact regarding whether Dobrzykowski's impermissible motive and her retaliation against Isabell based on that motive. Considering "plaintiff's version of the facts," this much is certain: Dobrzykowski knew of Isabell's Article, and based on her animus against the pro-life viewpoint contained in the Article, undertook a process to quash Isabell's chances of getting a position at IUSB.

Because disputed issues of material fact underlie Plaintiff's First Amendment retaliation claim, Dobrzykowski cannot possibly be granted qualified immunity. *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1367 (7th Cir. 1993) ("As there was a disputed factual issue regarding why defendant dismissed plaintiff, the district court was in no position to grant summary judgment in defendant's favor on the issues of qualified immunity against plaintiff's First Amendment claims. Resolution of this issue is a predicate to any meaningful qualified immunity analysis.") (internal quotations and citation omitted).

### D. Defendants Have Waived any Defense of Notice under the Indiana Tort Claims Act.

Indiana's Conscience Statue provides that "[n]o hospital or other person shall

---

[5] Moreover, "a case with similar facts is not necessarily required; the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional." *Surita*, 665 F.3d at 860. *See also Alexander v. DeAngelo*, 329 F.3d 912 (7th Cir. 2003) ("The absence of a previous decision establishing liability on the same facts is not critical; 'the easiest cases [for liability] don't even arise.'") (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

discriminate against or discipline a person because of the person's moral beliefs concerning abortion." Ind. Code § 16-34-1-6. A person whose right under this statute has been violated may commence "[a] civil action for damages." Ind. Code § 16-34-1-7. While, as Defendants' state, Def. Br. at 25 n.3, there is a dearth of state and federal decisional law interpreting the statute, the text of the law is plain, and its application to the facts of this case more than apparent.

Defendants claim that the Indiana Tort Claims Act ("ITCA") bars Isabell's claim under the Conscience Statute because she failed provide the requisite notice under the ITCA. Def. Br. at 25-27. Defendants are wrong.

Assuming that the ITCA applies at all, Defendants have waived any defense regarding the lack of notice. The law is clear that, "when a plaintiff fails to give the required notice under the ITCA, the defendant has an affirmative defense which must be raised in a responsive pleading to the plaintiff's complaint." *City of Evansville v. Magenheimer*, 37 N.E.3d 965, 968 (Ind. Ct. App. 2015) (citation and internal marks omitted). The law is similarly clear that under Fed. R. Civ. P. 8(c), "a party must affirmatively state any avoidance or affirmative defense." For this reason, as this Court has unequivocally held, "if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived." *Bell Microproducts, Inc. v. Mkt. Dev. Specialists, Inc.*, No. 3:06-CV-082-CAN, 2008 U.S. Dist. LEXIS 39420, at *4 (N.D. Ind. May 14, 2008) (citing *Castro v. Chi. Housing Authority*, 360 F.3d 721, 735 (7th Cir. 2004)).

Among the fifteen affirmative defenses in Defendants' Answer [ECF Doc. 11], one is noticeably absent: an affirmative defense that Isabell failed to provide notice under the ITCA.

Because Defendants did not raise a lack of notice under the ITCA "at the time of filing an answer," and because, as discussed, there are disputed material facts whether the University discriminated against Isabell regarding her "moral beliefs concerning abortion," it is not entitled

to summary judgment as to Plaintiff's Indiana Conscience Statute claim.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied with respect to Plaintiff's 42 U.S.C. § 1983 retaliation claim against Defendant Dobrzykowski. Defendants' Motion for Summary Judgment should also be denied with respect to Plaintiff's state claim against Defendant University under Ind. Code § 16-34-1-6.

Respectfully submitted, this 4th day of September 2019,

/s/ *Francis J. Manion*
Francis J. Manion
Geoffrey R. Surtees
AMERICAN CENTER FOR LAW & JUSTICE
P.O. Box 60
New Hope, Kentucky 40052
Tel. 502-549-7020; Fax 502-549-5252
fmanion@aclj.org

/s/ *Edward L. White III*
Edward L. White III
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Road, Suite 203
Ann Arbor, Michigan 48105
Tel. 734-680-8007; Fax 734-680-8006
ewhite@aclj.org

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2019, a copy of the foregoing, PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Francis J. Manion*
Francis J. Manion
Attorney for Plaintiff