UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CYNTHIA ISABELL,

                  Plaintiff,

        v.                              CAUSE NO. 3:18cv364 DRL-MGG

THE TRUSTEES OF INDIANA
UNIVERSITY and TERESA
DOBRZYKOWSKI,

                  Defendants.

OPINION AND ORDER

When Indiana University passed Dr. Cynthia Isabell over for a full-time position as a clinical assistant professor in the nursing school, she sued claiming that her recent blog exposing her pro-life views on abortion motivated its retaliation. Although she originally asserted several claims, at this stage she presses only two: a First Amendment claim against Dr. Teresa Dobrzykowski individually, and a claim under the Indiana Conscience Statute against the Trustees of Indiana University.

All other claims have been abandoned; and in several respects rightfully so because, for instance, the Eleventh Amendment would bar money damage claims against Indiana University and its Board of Trustees as well as state representatives (such as Dr. Dobrzykowski) in their official capacities. *See, e.g., Haynes v. Indiana University*, 902 F.3d 724, 731-32 (7th Cir. 2018); *Peirick v. Indiana Univ.-Purdue Univ. Indianapolis Athletics Dept.*, 510 F.3d 681, 695 (7th Cir. 2007). These other claims abandoned and dismissed, the court addresses only what remains.

BACKGROUND

Indiana University hired Dr. Isabell on August 1, 2016 as an adjunct professor in the school of nursing at the Indiana University South Bend campus. ECF 27-1 at 27:10-29:25. She returned to teach a maternal-child nursing course during the spring 2017 semester. *Id.* at 31:23-32:3. Dr. Isabell

has a doctorate in nursing practice and many years of experience in clinical practice and instruction. ECF 27-2 at 61-64; ECF 34-15 at 2.

On August 12, 2016, Dr. Isabell published a blog article titled *How a Formerly Pro-Choice Nursing Instructor Discusses Abortion with Her Students*. ECF 27-5. Dr. Isabell described the blog as "libertarian" discussing "social, medical, and political" issues. ECF 27-1 at 64-65. In the article, she explains that she philosophically had been pro-choice at one time and even had assisted with therapeutic abortions, but over time she changed to a pro-life view "based on the anatomy and physiology of pregnancy, and on logical reasoning," and on "biology, human anatomy and physiology, and not a particular religion." ECF 27-5. Dr. Isabell testified that she did not discuss this article with anyone at Indiana University. ECF 27-1 at 65-66, 92, 127.

On October 18, 2016, Indiana University posted a new clinical assistant professor of nursing position that was full-time for the 2017-2018 academic year and required a specialization in maternal newborn and women's health nursing. ECF 27-1 at 52; 27-2 at 66. Indiana University formed a search and screen committee to receive and evaluate applicants, conduct interviews, and ultimately make a recommendation for hiring to the Dean of Indiana University South Bend's College of Health Sciences. Four faculty members in the nursing school served on the committee: Dr. Teresa Dobrzykowski served as chair; Professor LeAnna LeLime, Professor Barbara White, and Professor Joyce Palmateer served as members. ECF 27-10 at 14-21; 27-11 at 11.

Dr. Cynthia Isabell and Ms. Angela Gatto applied for the clinical assistant professor position, sometimes called the CAP. ECF 27-1 at 53:24-54:3, 57:14-25. At the time of application, Ms. Gatto was teaching obstetrics nursing at Ivy Tech Community College in South Bend. ECF 27-12 at 8:5-24. After reviewing the materials submitted, the search and screen committee chose to interview both candidates. ECF 27-2 at 90:14-19. Dr. Isabell was interviewed on January 30, 2017, and Ms. Gatto was interviewed on February 2, 2017. ECF 27-1 at 59:5-11; ECF 27-12 at 11:19-20; ECF 13.

2

Thus began the first part of the hiring process. ECF 14. This interview was intended to consist of committee members asking the candidates questions from a pre-determined list prepared in advance of the interviews. ECF 27-1 at 61:11-62:24; ECF 27- 2 at 36:3-10; ECF 27-15. That same list of questions was supposed to be used for each candidate for the same position. ECF 27-9 at 16-17.

During Dr. Isabell's interview, Dr. Dobrzykowski also asked the following question: "How would you discuss controversial topics, healthcare controversial topics, and introduce them to students in a teaching manner." ECF 27-2 at 36:7-25; *see also* ECF 27-1 at 63:5-22 (testifying that Dr. Dobrzykowski asked her, "using science, how would [she] discuss a controversial issue with [her] nursing students when [she's] at clinical"). Dr. Dobrzykowski testified that she frequently asks this question of candidates during the interview process because "in healthcare there are a lot of ethical dilemmas and concerns" and the question is "about seeing how [the candidate] would provide students an opportunity to talk about things that normally occur in everyday nursing." ECF 27-2 at 37:16-38:4. According to Ms. Gatto, no one, including Dr. Dobrzykowski, asked her questions about how she would teach or introduce a controversial topic to students. ECF 27-12 at 22:9-18. Nor did anyone, including Dr. Dobrzykowski, ask Ms. Gatto about abortion. *Id.* at 23:6-7.

Although Dr. Dobrzykowski believes she asked this same question of Ms. Gatto during her interview with the search and screen committee (ECF 27-2 at 37:12-15), Ms. Gatto does not remember being asked this type of question (ECF 27-12 at 22:9-14). Dr. Dobrzykowski claims she had no knowledge of Dr. Isabell's viewpoint on abortion at that time. ECF 27-2 at 90:4-13. Dr. Isabell testified in response to the question: "I just sat there with my mouth open. I thought to myself – so I thought to myself, she read my article. That was the first thing I thought." ECF 27-1 at 63:23-64:2. Dr. Dobrzykowski agreed that the question closely matched the title of Dr. Isabell's article. ECF 27-2 at 88:6-18.

3

Professor Palmateer testified that Dr. Dobrzykowski asked Dr. Isabell, "In light of recent controversy, how will you use science to have discussion with your students?" ECF 34-5 at 28-30. Professor Palmateer thought "at that time it was right in the midst of lots of Planned Parenthood's controversy and lots of abortion issues . . . There was no other real controversy at the time that I could think of." *Id.* Professor Palmateer saw Dr. Dobrzykowski "kind of prodding a little bit more and a little bit more." *Id.* So Professor Palmateer interjected to move the conversation to something appropriate by saying: "Abortion isn't an issue. This is a mother baby unit. They've had the baby." *Id.* at 30:10-14.

Dean Clark testified that her expectations of any Indiana University search committee would include consistency in the questions asked of candidates, a complete avoidance of questions about religious, moral, or political beliefs, and uniformity in the manner in which interviews are conducted. *Id.* at 42:2-43:6; 68:8-69:9. Indeed, Indiana University policies governing search and screen committee interviews, which Dean Clark testified would have applied during the Isabell/Gatto interviews, were clear that, (1) "[t]he goal of the interview is to collect accurate information in a uniform manner from all respondents"; (2) interviewers should "[a]sk the same questions of each candidate"; (3) "[a]sking different questions of each candidate leads to a skewed assessment of who would best perform the job." ECF 34-8 at 41:7-12; ECF 34-9 at 1-2, "Best Practices for a Successful Interview," Indiana University, Human Resources.

The next part of the hiring process for both candidates was a mock teaching presentation to the search and screen committee and other faculty members of the School of Nursing. ECF 27-1 at 72:7-73:14; ECF 27-13; ECF 27-14. All faculty members in the School of Nursing received an open invitation to attend the teaching presentations if their schedules permitted. ECF 27-10 at 99:11-19; ECF 27-11 at 74:18-75:3. The teaching presentations were an integral part of the hiring process because it gave faculty members "an idea of how [the candidate] would be in a classroom, their

4

strengths and weaknesses." ECF 27-11 at 56:25-57:4; *see also* ECF 27-10 at 91:1-14 (noting that "the interview presentations [are] very revealing"). The search and screen committee and faculty members who attended each presentation were provided evaluation forms to fill out with comments regarding each candidate. ECF 27-2 at 79:6-14, 99:21-5; *see also generally* ECF 27-14 at 3; ECF 27-17; ECF 27-18.

After the interviews with the search and screen committee and teaching presentations for both candidates concluded, Dr. Dobrzykowski compiled the notes that were taken by the committee and faculty members and created a chart detailing the strengths and weaknesses of both candidates. ECF 27-2 at 104:6-106:24; *see* ECF 27-19. Dr. Dobrzykowski sent the chart to Dean Clark for use in her own evaluation of the two candidates. ECF 27-2 at 107:21-108:7; ECF 27-9 at 73:19-77:5. In addition, on behalf of the search and screen committee, Dr. Dobrzykowski sent an email to Dean Clark recommending Ms. Gatto for the CAP position. *See* ECF 27-19. Dr. Dobrzykowski testified that the search and screen committee "had a strong agreement about which candidate [it] preferred." ECF 27-10 at 68:5-13.

Although Dean Clark spoke briefly on the phone with both Dr. Isabell and Ms. Gatto, and reviewed their curriculum vitaes, she attended neither interview, and did not review the written evaluations completed by the faculty members who observed the teaching presentations. ECF 27-9 at 76:23-77:14. When asked what documents she reviewed in deciding whether to accept the recommendation of Ms. Gatto for the position, the first document Dean Clark referred to in her deposition was the table of "strengths and concerns" of each candidate. *Id.* This was the table prepared by Dr. Dobrzykowski only after she had already conveyed to Dean Clark, in an email purportedly submitted "on behalf of the committee," what she claimed to be her committee's recommendation of Ms. Gatto. As Dean Clark describes it, "she said they wanted to recommend Angela and I think I told [Dr. Dobrzykowski] that she needed to give me strengths and weaknesses of each candidate and provide rationale for the recommendation priority." *Id.* at 74:20-75:2. Dean Clark needed this

information from Dr. Dobrzykowski "[t]o make sure that an unbiased presentation of information was given to [her] for decision-making." *Id.*

Once Dean Clark reviewed Dr. Dobrzykowski's emails regarding the recommendation and table of strengths and weaknesses purportedly made on behalf of the search and screen committee, Dean Clark evaluated Dr. Isabell and Ms. Gatto. ECF-27-9 at 76:12-77:5. As the Interim Dean for Indiana University South Bend's College of Health Sciences at that time, Dean Clark was the ultimate decisionmaker on which candidate to hire and was not bound by the recommendation of the search and screen committee. *Id.* at 15:10-22, 20:5-21:17, 45:9-22. Rather, Dean Clark had the authority to accept or reject the recommendation of the committee based on her own assessment of the candidates; and, in fact, she had rejected such recommendations in the past. *Id.* In making her decision, Dean Clark considered the candidates' respective curriculum vitaes, the strengths and weaknesses chart provided by the search and screen committee, and her own interviews of both candidates. *Id.* at 76:19-77:14; ECF 27-1 at 79:19-80:5; ECF 27-12 at 16:8-12; *see also* ECF 27-9 at 9:2-16, 57:3-58:7. After her phone interviews, Dean Clark testified that Ms. Gatto "answered questions very well," "demonstrated a good sense of teaching and learning," and "had a strong teaching and learning philosophy." ECF 27-9 at 58:8-17. She also testified that Dr. Isabell, on the other hand, was "[n]ot as passionate," "didn't have as much energy," "answered questions appropriately, but not as much depth or detail as Ms. Gatto," and was much "more vague" in her answers to questions. *Id.* at 59:2-15.

Ultimately, Dean Clark decided to hire Ms. Gatto. *Id.* at 45:9-22, 96:5-19. It is undisputed that, at the time she made her decision, Dean Clark had absolutely no knowledge of Dr. Isabell's viewpoint on abortion or the article. *Id.* at 93:11-15, 93:24-94:19; *see also* ECF 27-1 at 101:6-8.

On February 20, 2017, Dr. Dobrzykowski met in person with Dr. Isabell and notified her that Ms. Gatto had been chosen for the position. ECF 27-1 at 81:23-82:10; ECF 27-2 at 108:8-15, 109:1-

5, 110:13-111:17; ECF 27-22. Dr. Isabell remained employed with Indiana University as an adjunct professor for the remainder of the spring 2017 semester. ECF 27-1 at 31:23-25, 102:12-15.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The court must deny a summary judgment motion when there is admissible evidence that creates a genuine issue of material fact—a triable issue. *Luster v. Ill. Dept. of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011).

The court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

## DISCUSSION

A.    *Eleventh Amendment Immunity Does Not Bar the Individual Capacity Claim Against Chairperson Teresa Dobrzykowski.*

The parties disagree whether this suit properly frames a *bona fide* individual capacity claim against Dr. Dobrzykowski. Indiana University claims the Eleventh Amendment bars this claim because it is, in reality, one based on official actions Dr. Dobrzykowski took in her role as a faculty member in Indiana University's interview and hiring process. *See, e.g.,* ECF 38 at 3-4.

Section 1983 authorizes a cause of action for deprivation of constitutional rights "under color of state law" committed by a "person" that the law defines precisely. Dr. Dobrzykowski is just such a

person, but not in her official capacity. *See Omosegbon v. Wells*, 335 F.3d 668, 672-74 (7th Cir. 2003). An official capacity suit alleges that an individual defendant implemented an official policy or custom of the state agency in a manner that the state agency remains the real party, whereas an individual capacity suit focuses on that individual's constitutional torts committed under color of state law. *Hill v. Shelander*, 924 F.2d 1370, 1372 (7th Cir. 1991). An official capacity suit presupposes that the entity's policy or custom played a role in the violation of federal law. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). It follows that a victory in a personal action is one against the individual, not the entity that employed her. *See id.* at 167-68.

"The Eleventh Amendment is an explicit limitation of the judicial power of the United States." *Missouri v. Fiske*, 290 U.S. 18, 25 (1933). Under the Eleventh Amendment, the "judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State or by citizens or subjects of any foreign State." The Eleventh Amendment thus bars federal claims that otherwise would be within the court's jurisdiction, including § 1983 claims for damages against state officials in their official capacities or damage claims effectively against the state treasury. *Pennhurst State Sch.& Hosp. v. Halderman,* 465 U.S. 89, 119-120 (1984); *Miller v. Smith*, 220 F.3d 491, 494 (7th Cir. 2000).

"On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166. The difference between individual and official capacity claims turns not on the capacity in which the individual defendant acted when violating the federal right, but instead on who is the real party. *Hafer v. Melo*, 502 U.S. 21, 27-30 (1991); *see also Lewis v. Clarke*, 137 S. Ct. 1285, 1292 (2017). Indeed, that point has been long settled: the "Eleventh Amendment provides no shield for a state official confronted by a claim that [she has] deprived another of a federal right under color of state law." *Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974). Damage awards against individual defendants in federal

court thus remain a "permissible remedy" notwithstanding the individual's holding of public office. *Id.* at 238; *accord Hafer*, 502 U.S. at 30. The "Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Hafer*, 502 U.S. at 31.

The complaint alternatively pleaded both capacities (ECF 1); but Dr. Isabell has honed only her individual capacity claim now. The complaint alleges that Dr. Dobrzykowski has been named and sued in her individual capacity, that she acted under color of state law in violating Dr. Isabell's constitutional rights, and that she is entitled to both punitive and compensatory damages against Dr. Dobrzykowski, which would be recoverable only through an individual capacity suit. ECF 1 ¶¶ 9, 32, Prayer-B. Of course, Dr. Isabell cannot rest solely on her pleading at the summary judgment stage, but Indiana University has not established that, as a matter of law, Dr. Isabell cannot proceed on an individual claim against Dr. Dobrzykowski for damages. Dr. Isabell has not claimed that Dr. Dobrzykowski acted pursuant to an official policy; indeed, the position seems quite to the contrary—that Dr. Dobrzykowski acted unconstitutionally without an official policy. In fact, Indiana University underscores this very point with sworn statements that Dr. Dobrzykowski, both in the questioning and review process, acted contrary to Indiana University's procedures—not because of a policy. ECF 27-1 at 131:4-19; ECF 27-6 at 5.

In *Omosegbon*, 335 F.3d at 672-74, this circuit affirmed the dismissal of money damage claims against the state (Indiana State University) and against individual defendants in their official capacities, doing so however recognizing that the parties in these capacities were not "persons" under 42 U.S.C. § 1983 and foregoing an Eleventh Amendment analysis. The court recognized that the individual capacity claim presented a "slightly more complex question" because, while it presented an otherwise acceptable individual capacity claim for damages, the claim necessarily sought those damages under an employment contract that "inescapably" would be paid by the state. *Id.* at 673. Notably, the

individual defendants were not parties to the contract in their individual capacities, so the claim was not a *bona fide* individual capacity claim but one against the university. *See id.* The claim against Dr. Dobrzykowski is rightfully an individual claim; it is not nominally against her or in reality based on an employment agreement that only triggers the state's obligations or coffers. Here, there was no employment contract at issue between the state and Dr. Isabell.

In *Haynes v. Indiana University*, 902 F.3d 724, 728-729 (7th Cir. 2018), an African-American professor of six years lost his bid for tenure and sued under Title VII and 42 U.S.C. § 1981(a). The court focused on the "knotty and fact-bound inquiry" of his individual capacity claim for damages against the president and provost who acted pursuant to university policy to approve finally a tenure decision from the vice provost. *Id.* at 728, 732. The professor was under a probationary contract that provided the university would evaluate tenure following his six-year initial term. *Id.* The court found that case "materially the same" as *Omosegbon* because those university administrators were not parties to his employment contract. *Id.* at 732. That is not the issue here, so *Haynes* likewise does not answer the question before this court whether the individual suit against Dr. Dobrzykowski is in reality one against the state.

Indiana University's argument that Dr. Dobrzykowski cannot be sued in her individual capacity because it was only by virtue of her office and hiring role that she had the authority to interview and make a recommendation about not hiring Dr. Isabell cannot be right; and indeed, it has been rejected by this circuit. *See, e.g., Luder v. Endicott*, 253 F.3d 1020, 1022 (7th Cir. 2001) (rejecting this same view as espoused by the Eleventh Circuit); *see also Hafer*, 502 U.S. at 27-30. That is Indiana University's sole argument for a *bona fide* official capacity claim in reply (ECF 38 at 4-5), but that argument misapprehends the Eleventh Amendment analysis.

"The general rule is that such [personal] suits are not barred by the amendment, because the plaintiff is seeking damages from individuals rather than from the state treasurer." *Luder*, 253 F.3d at

1022-23. That Indiana University may choose to indemnify Dr. Dobrzykowski or that a judgment may exceed her capacity to pay (unless indemnified) is irrelevant. *See id.* at 1023. That said, the court remains obliged to consider whether this claim "may really and substantially be against the state," *id.*, but the court does not think that conclusion is so inescapable here as it was in *Luder*, *Omosegbon*, or *Haynes*. This is not a suit nominally against a state employee in her individual capacity that "*demonstrably* has the *identical* effect as a suit against the state." *Id.* It does not interfere with public administration, restrain or compel the state to act, or necessarily expend public treasury funds. *See Halderman*, 465 U.S. at 101 n.11; *Dugan v. Rank,* 372 U.S. 609, 620 (1963).

To presume blindly that every suit against an individual state official cannot be paid by that individual and necessarily calls into question the public treasury would collapse this circuit's distinction under the Eleventh Amendment, not to mention *Hafer*, 502 U.S. at 28. If that distinction is to have any vitality, it must be in a case such as this. Indiana University points to no employment contract (past or prospective), salary, benefits, or other measures of recovery that would necessarily implicate the state. Instead, Dr. Isabell adheres to a request for money damages against Dr. Dobrzykowski "for her actions done in her individual capacity in an amount to be determined by a jury." ECF 1 at 7. This case does not seek to recover under an employment agreement to which the state is the only and true signatory; quite the opposite, it complains that Dr. Dobrzykowski interfered and retaliated against Dr. Isabell to prevent any such employment relationship with Indiana University from being formed.

In addition, Dr. Isabell has requested punitive damages in this respect (ECF 1 at 7), knowing full well that such damages could not be recovered against the state because of its immunity, but could be recovered against Dr. Dobrzykowski. *See Smith v. Wade*, 461 U.S. 30, 35-36 (1983); *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998); *Reinebold v. Indiana Univ. at South Bend*, 2019 U.S. Dist. LEXIS 71367 at 7-8 (N.D. Ind. April 25, 2019) (DeGuilio, J.). That fact further distances this case from *Omosegbon* and *Haynes*.

The unpublished case from our sister federal court advanced by Indiana University doesn't change this result. In *Wade v. Indiana University Sch. of Medicine*, 2019 U.S. Dist. LEXIS 116115 at 25 (S.D. Ind. July 12, 2019) (Pratt, J.), the court granted summary judgment based on sovereign immunity, but did so appreciating that neither Title VII, 42 U.S.C. § 2000e *et seq.*, nor the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, permitted individual liability. It thus *was* an inescapable conclusion that such claims could not be *bona fide* individual. In addition, implicit to *Wade* was the recognition that the learning specialist's claims there implicated an employment contract, else 42 U.S.C. § 1981 would not have been at issue. *See id.* at 24; *Walker v. Abbott Labs.*, 340 F.3d 471, 475 (7th Cir. 2003) ("§ 1981 protections still center on contractual rights" and "proof of a contractual relationship is necessary to establish a § 1981 claim"). This civil rights statute gives "[a]ll persons within the jurisdiction of the United States" the same right "to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). With that in mind, *Wade* falls in line with circuit precedent, yet at the same time has little persuasive bearing on this quite different case that is not so constrained only to official capacity or employment contract claims with the state as the operative party. *See Haynes*, 902 F.3d at 731; *Omosegbon*, 335 F.3d at 673; *accord Calautti v. Shanahan*, 2019 U.S. Dist. LEXIS 132034 at 20 (S.D. Ind. Aug. 7, 2019) (Pratt, J.) (permitting individual claims for money damages despite sovereign immunity).

In short, the Eleventh Amendment does not bar the claim for money damages against Dr. Dobrzykowski in her individual capacity, and Indiana University's summary judgment motion on this point must be denied.

B.      *Genuine Triable Issues Remain on the First Amendment Retaliation Claim.*

The First Amendment generally prohibits state officials from retaliating against an individual who has engaged in protected speech. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "If an official takes adverse action against someone based on that forbidden

motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." *Nieves*, 139 S. Ct. at 1722 (quotations omitted); *see also Crawford-El v. Britton*, 523 U.S. 574, 593 (1998); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283-84 (1977).

In the public employment context, a § 1983 claim for retaliation in violation of First Amendment rights involves a three-part analysis: (1) whether the speech is "constitutionally protected," (2) whether the speech was a "substantial or motivating factor in the retaliatory action," and (3) whether, as a defendant must show, the "same action would have been taken in the absence of the employee's protected speech." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004) (citations omitted). The parties grapple with the second and third elements of this claim, as well as the subject of pretext; and therein genuine triable issues remain.

The parties initially disagree about the causation standard. At the summary judgment stage, and to establish a *prima facie* case of retaliation, Dr. Isabell must show that her speech was a "motivating factor" of Dr. Dobrzykowski's deprivation of her federally protected right. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2014); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). The burden then shifts to the defendant "to rebut the causal inference raised by the plaintiff's evidence." *Kidwell*, 679 F.3d at 965. If the defendant has not countered the plaintiff's evidence, then its retaliatory actions are considered a "necessary condition" to the harm or deprivation, and the plaintiff has established the causation needed to succeed on her claim. *Id.* "To demonstrate the requisite causal connection in a retaliation claim, [a] plaintiff[] must show that the protected activity and the adverse action are not wholly unrelated." *Id.* at 966 (quoting *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000)) (quotations omitted).

"To show that [adverse action] was motivated by [her] protected speech, [a plaintiff] must first demonstrate that the defendants knew of the protected speech." *McGreal v. Village of Orland Park*, 850

F.3d 308, 313 (7th Cir. 2017); *see also Wackett v. City of Beaver Dam*, 642 F.3d 578, 582 (7th Cir. 2011). Indiana University claims that there is no evidence that Dr. Dobrzykowski, Dean Clark, or the three other committee members knew about Dr. Isabell's viewpoint on abortion or the article.

Dean Clark, on this record, had no knowledge of Dr. Isabell's article or views on abortion. ECF 27-9 at 93-94. Professor Barbara White had no knowledge of the article. ECF 27-10 at 93. Professor Leanna Lalime likewise testified that she had never seen Dr. Isabell's article or discussed the article with anyone. ECF 27-11 at 63. Professor Joyce Palmateer also testified that she was not aware of Dr. Isabell's article before the interview. ECF 27-21 at 31.

Dr. Dobrzykowski—against whom the retaliation claim pends individually—is at best equivocal about when she learned about the article. On one hand, she testified that she does not "remember" having known about the article at the time Dr. Isabell interviewed for the position; later she testified that she learned about the article "after" the interview; and on the other hand, she testified that the article "came out in a conversation at the time of her interview." ECF 27-2 at 87-88. The credibility determination of which answer to credit—whether at the time of the interview or afterwards, if she can even remember and be certain that it was afterwards—is for the jury at this stage. A reasonable jury could credit her testimony that she knew about the blog at the time of the interview.

A reasonable jury would not be left just with Dr. Dobrzykowski's equivocation. The search and screen committee intended to work off a pre-determined list of questions prepared before the interviews—indeed Indiana University published a human resources "best practices" that recommended asking candidates the same questions (ECF 34-9 at 1)—but Dr. Dobrzykowski went beyond those questions just for Dr. Isabell. She treated her differently, and against university protocol. *See Kidwell*, 679 F.3d at 969 (abandonment of hiring policies was circumstantial evidence of a retaliatory motive). For instance, Dr. Dobrzykowski asked Dr. Isabell the following question: "How would you

14

discuss controversial topics, healthcare controversial topics, and introduce them to students in a teaching manner?" ECF 27-2 at 36:7-25; *see also* ECF 27-1 at 63:5-22 (testifying that Dr. Dobrzykowski asked her, "using science, how would [she] discuss a controversial issue with [her] nursing students when [she's] at clinical"). To the extent there is any ambiguity in the question, that issue is for the jury. *See Shager v. Upjohn Co.,* 913 F.2d 398, 402 (7th Cir. 1990) ("the task of disambiguating ambiguous utterances is for trial, not for summary judgment").

Dr. Dobryzkowski denies asking the question of only Dr. Isabell (ECF 27-2 at 36-37), and it is difficult not to believe a reasonable jury could find this response as dissembling when most everyone agrees she did. Even Ms. Angelo Gatto, the other candidate, testified that Dr. Dobrzykowski never asked her about abortion, pro-life views, or teaching controversial issues. ECF 27-12 at 22:2-18.

Professor Barbara White recalls the questioning being even more direct. When asked what questions were posed to Dr. Isabell and not Ms. Angela Gatto, Professor White testified that there were "multiple questions," but the one she could clearly recall was "a question about being pro-life and whether or not she would be able to teach" and "whether that would interfere with her ability to teach birth control." ECF 27-10 at 29. Although she could not remember the exact words of the question, she said she clearly remembered "pro-life." *Id.* Thus to at least one committee member a reasonable jury could find that Dr. Dobrzykowski was tying together "being pro-life" with the "inability to teach" at Indiana University—an animus deserving no place in hiring decisions at a prestigious state university.

The question troubled more than one committee member. The question posed by Dr. Dobrzykowski motivated Professor Palmateer to interject, saying "Abortion isn't an issue. This is a mother baby unit. They've had the baby." ECF 34-5 at 30. She did so only after Dr. Dobrzykowski continued to prod more and more on the subject—"dancing back and forth on that a little bit"—and only after Professor Palmateer "was just tired of it." *Id.* at 29-30. According to Professor Palmateer,

she could not understand "[w]hy [we were] even talking about this," and it made her "uncomfortable." *Id.* at 30. Professor Palmateer interpreted the question to be one about abortion. *Id.* at 30-31. Dr. Dobrzykowski did not correct Professor Palmateer to explain that her questions were not about abortion or being pro-life. *Id.* Professor Palmateer was concerned enough about the exchange that later she would express the view that she was "unhappy" with the interview process and concerned that her "view on life could be a reason [she] could or couldn't get a job." *Id.* at 43-44.

Professor White said "the committee members were not satisfied with the process, knew that steps had been missed that . . . should not have been missed in the process." ECF 34-6 at 37. Professor White ultimately filed a complaint with Indiana University's Affirmative Action Office over the way Dr. Dobrzykowski handled the interviews. *Id.* at 54. She complained that it was "not uniform and did not follow campus policy." *Id.* at 55. Professor White expressed the view that Dr. Dobrzykowski's "inappropriate question" had "made [the university] legally vulnerable." *Id.* Professor White felt "disappointment in the leadership of the chair of the search and screen." *Id.* at 37. The question about being "pro-life" was apparently a shot heard around campus as faculty outside the process learned about it and became "appalled"; and even more, the subject was discussed within the search and screen committee. *Id.* Whether then everyone was aware of the article or Dr. Isabell's views on abortion at the time of the interview, a reasonable jury could find that Dr. Dobrzykowski knew and that her questioning infected the process of deliberation.

Professor Palmateer said there was a lack of uniformity between the interviews and teaching presentations of the two candidates. Dr. Dobrzykowski did not ask Ms. Gatto a question similar to the one she asked Dr. Isabell about "controversial" issues. ECF 34-5 at 32. She was "surprised" that Dr. Dobrzykowski deviated in this way from normal university practice. *Id.* She too considered the interviews unfair and inconsistent, and remained particularly troubled by how Dr. Dobrzykowski

made the decision about the recommendation without ever inviting input from the committee members. *Id.* at 68-69.

Professor LaLime, an acquaintance of Ms. Gatto and former classmate, agreed that the process was not right, fair, or entirely uniform. ECF 34-7 at 13, 33-34. Professor LaLime found Dr. Dobrzykowski's question "off-putting" and observed that the chairperson's "demeanor was different during that moment." *Id.* at 30.

According to Dean Clark, however, "[t]here should be a standard set of questions asked of each applicant." ECF 34-6 at 16:17-19. Asking the same questions allows for "consisten[t] information for comparison." *Id.* at 17:3. Indeed, Indiana University policies for search and screen committees require that information be gathered in a "uniform manner" from candidates and that interviewers ask the "same question." ECF 34-9 at 1-2. The policies themselves explain why such uniformity is necessary: "Asking *different* questions of each candidate *leads to a skewed assessment* of who would best perform the job." *Id.* (emphasis added.)

The unfairness that committee members observed in the interview and evaluation process had an effect on Dr. Isabell. ECF 27-1 at 75. Moreover, once Dr. Dobrzykowski began asking Dr. Isabell about what Dr. Isabell took to be her abortion stance during her interview, she testified that her entire performance during both the interview and subsequent teaching presentation went markedly downhill: "I felt that Teri had read my article, I assumed that everybody knew about it and that—I just felt—I just felt like I was playing to a hostile crowd, basically, and I felt very intimidated." *Id.* at 75:5-10. Dr. Isabell says that during the teaching presentation to the faculty who were in the room she "felt totally out of sync with what I was doing" and "I just assumed, oh, great, everybody knows about this, and I don't know these people. I don't know how they feel about my position on abortion. I just felt like— I just felt—I was very uncomfortable, and I felt very anxious." *Id.* at 75:24-76:10.

17

This evidence creates triable issues on whether Dr. Dobrzykowski not just knew about the article, but was indeed motivated by it. Dr. Isabell also points out that a jury would learn that Dr. Dobrzykowski spent close to 30 years of clinical appointments with the country's largest abortion provider—Planned Parenthood—though Dr. Dobrzykowski identifies as pro-life and never worked at a location where abortions were performed. ECF 34-3 at 147, 154. Instead, Dr. Dobrzykowski claims she only assisted women and men with family planning, birth control, reproductive care, and sexually transmitted infections, screening, and treatment. *Id.* at 147-54. In fairness, on this record, these facts seem less material to the court, *cf. Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004), but a reasonable jury could factor it into the analysis of Dr. Dobrzykowski's motivation, particularly when Professor White believes Dr. Dobrzykowski is in fact "pro-choice" and Dr. Isabell says she has heard Dr. Dobrzykowski disparage a doctor for being "pro-life." ECF 34-6 at 93; 34-4 at 35-37.

Triable issues existing thus far, the burden shifts to the defendant to establish that the same recommendation and decision would have been made anyway. *See Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013); *Thayer v. Chiczewski*, 705 F.3d 237, 251-52 (7th Cir. 2012). The defendant can rebut the evidence of retaliatory motive "but only by showing that [its] conduct was not a necessary condition of the harm—the harm would have occurred anyway." *Mays*, 719 F.3d at 634. Ultimately, "the motive must *cause* the injury." *Nieves*, 139 S. Ct. at 1722. That is to say, "it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*; *see also Hartman v. Moore*, 547 U.S. 250, 260 (2006); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

For many retaliation claims, establishing the causal link between animus and injury is straightforward. "Indeed, some of our cases in the public employment context have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other, shifting the burden to the defendant to show he would have taken the challenged

action even without the impermissible motive." *Nieves*, 139 S. Ct. at 1722 (quoting *Hartman*, 547 U.S. at 260) (quotations omitted); *see also Mt. Healthy*, 429 U.S. at 287. "If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind. It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman*, 547 U.S. at 260.

This case presents more complexity. Dr. Dobrzykowski made a recommendation, not the final decision to hire Ms. Gatto over Dr. Isabell. Dean Clark made the ultimate decision. The animus must have caused not just the retaliatory recommendation then, but ultimately induced or caused the decision of another person (Dean Clark) not to hire Dr. Isabell. *See Hartman*, 547 U.S. at 262 ("Thus, the causal connection required here is not merely between the retaliatory animus of one person and that person's own injurious action, but between the retaliatory animus of one person and the action of another."). The record must permit a reasonable jury to conclude that Dean Clark's decision not to hire Dr. Isabell was the "intended consequence" of Dr. Dobrzykowski's retaliatory animus. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) ("Animus and responsibility for the adverse action can both be attributed to the earlier agent . . . if the adverse action is the intended consequence of that agent's discriminatory conduct.").

This circuit has recognized the weight of authority supporting individual liability under § 1983 on "subordinate governmental employees with unlawful motives who cause the real decision-makers to retaliate." *Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012). In such scenarios, a subordinate cannot use the superior's nonretaliatory motive as a shield against liability so long as the decisionmaker would not have taken the adverse action but for the subordinate's retaliatory animus. *Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir. 2002); *see also Saye v. St. Vrain Valley Sch. Dist.*, 785 F.2d 862, 867 (10th Cir.

1986) (reversing directed verdict for school principal in teacher's § 1983 retaliation action when superintendent and thereafter school board necessarily relied on principal's recommendation of non-renewal); *Professional Assn. of College Educators v. El Paso County Comm. College Dist.*, 730 F.2d 258, 266 (5th Cir. 1984) (affirming liability under § 1983 against college president who recommended discharge of faculty members in retaliation for First Amendment activity after board followed that recommendation, saying it is "not necessary that the improper motive be the final link in the chain of causation: if an improper motive sets in motion the events that lead to termination that would not otherwise occur, intermediate step[s] in the chain of causation do not necessarily defeat the plaintiff's claim") (quotations omitted).

Dr. Dobrzykowski can be held individually liable for retaliatory conduct that would expose Indiana University to liability. *See Smith*, 681 F.3d at 899. Using the causation analysis inherent in tort litigation, if Dean Clark would not have passed Dr. Isabell over had it not been for Dr. Dobrzykowski's recommendation, a recommendation that the jury could reasonably find was motivated by retaliatory animus, then that effort at retaliation was a cause of Dr. Isabell's harm.[1] *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004); *see also Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (committee's decision was tainted by district manager who made prejudicial recommendation); *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 754 (7th Cir. 2000) ("if the perception of poor work performance was based upon [the subordinate's] input, then [the plaintiff] has presented sufficient evidence"); *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1122 (7th Cir. 1998) (supervisor's discriminatory animus tainted decisionmaker since supervisor wrote series of memoranda about plaintiff).

On that point the record also leaves a triable issue. Substantial testimony has been adduced that the process was unfair and contrary to university protocol. Although an employer needn't "rigidly

---

[1] This circuit has explained that this principle remains true "whether or not [the ultimate decisionmaker] could reasonably be thought a mere cat's paw." *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 (7th Cir. 2004).

adhere to procedural guidelines" to avoid an inference of retaliation, a "systematic abandonment of its hiring policies is circumstantial evidence" of retaliatory motive. *Rudin v. Lincoln Land Comm. College*, 420 F.3d 712, 723 (7th Cir. 2005); *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992) (holding that the employer's deviation from its established procedure when terminating the plaintiff was circumstantial evidence of retaliation). Here, all committee members, except Dr. Dobrzykowski, expressed serious concerns about the interview and hiring process. There appears to be no evidence designated that Dean Clark was advised of these many concerns, thus leaving her in the dark.

Indiana University claims that each one of the search and screen committee members preferred Ms. Gatto, and would have remained steadfast in that recommendation despite any animus, but this record lacks the support for such a broad statement. Indeed, the committee oddly never met to discuss the two candidates. The record does not seem to contain any policy requiring the committee to meet, and in argument counsel directed the court to no policy governing such committees, though Indiana University conceded that all members should be given the opportunity for input. ECF 35, Tr. 15-17. Dean Clark shared the expectation that every committee member should have "the opportunity to contribute to the recommendation." ECF 34-8 at 19.

The record reveals an unhealthy sense of urgency by Dr. Dobrzykowski to push through her recommendation without the full input of committee members concerned with her approach. *See Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009) (circumstantial evidence includes suspicious timing). Perhaps she was just that confident in Ms. Gatto; perhaps she was just that motivated by retaliatory animus; either way, the issue is for the jury.

To the key question of whether Indiana University would have made the same decision regardless of the inference of retaliatory motive, the evidence is not so one-sided in Indiana University's favor. Initially, Dr. Dobrzykowski avoided a final discussion among committee members,

whether by person or even email, and tried merely to have a discussion with Dean Clark to recommend against Dr. Isabell and for Ms. Gatto.

On February 2, 2017, within hours of the committee's interview of Ms. Gatto, Dr. Dobrzykowski sent an email to Dean Clark (at 5:12 p.m.) summarizing Ms. Gatto's strengths and providing no commentary whatsoever on Dr. Isabell. ECF 27-19. Dr. Dobrzykowski represented the email was "submitted on behalf of the committee," though that does not appear accurate. *Id.* The following morning, February 3, Dean Clark and Dr. Dobrzykowski conversed, and Dean Clark told the chair that she instead needed to provide the committee's recommendation and the rationale for that recommendation with strengths and weaknesses of *each* candidate. ECF 34-8 at 74-75; ECF 27-19. In response, before 1:00 p.m., Dr. Dobrzykowski sent Dean Clark an email with that recommendation. ECF 27-19. The summary of Ms. Gatto's strengths was nearly the same as her February 2 email; the summary for Dr. Isabell was relatively sparse and included only a few details. *Id.* The committee members were copied on both emails, but that is all. *See Long*, 585 F.3d at 350 (concerning suspicious timing).

That can hardly be called an opportunity for input. Professor Palmateer said the email came out and "it was a done deal. It was a moot point at this point." ECF 34-5 at 68. She wanted a "thoughtful conversation," saying "we should have discussed [the recommendation]." *Id.* at 69. She honestly confessed that she is not sure whether she would have made that same recommendation. *Id.* "[T]here were some things about Angela [Gatto] that made her the better choice, and there were some things about Cynthia [Isabell] that made her the better choice." *Id.* Professor Palmateer says she was "never given an opportunity to oppose" the recommendation. *Id.*

Professor LaLime also testified that the committee never formally met to discuss the pros and cons of the two candidates or to arrive at a consensus recommendation for Dean Clark, which deviated

from her experience with how Indiana University handled search and screen committees, particularly those she chaired in prior years. ECF 34-7 at 41.

Professor White testified that she "believe[s] in [her] soul that [they] made the right decision," and yet she too retained honest convictions that the process was not fair or uniform such that she "can't say whether the wrong decision was made based on the interview process." ECF 34-6 at 52. There is at least a genuine issue of material fact as to whether the committee would have proceeded with the same recommendation.

Despite this evidence, Indiana University claims that "an informal meeting and/or discussion did in fact take place." ECF 38 at 11-12. However, Professor White, when asked about whether the committee convened to discuss a recommendation, testified: "If it did, I have no memory of it." ECF 38-3 at 36. She could recall only "informal hallway conversations." *Id.* When the email from Dr. Dobrzykowski came out, Professor White's immediate thought was "I can't tell you how she knew how I felt or what my thoughts were about that." *Id.* at 47-48. Professor LaLime says an incomplete group of the committee members informally met after Ms. Gatto's interview, but not with all committee members and without identifying the list of strengths and weaknesses of each candidate. ECF 38-7 at 77-78. Professor Palmateer said there was no meeting with her. ECF 38-4 at 70-71. Of interest, the one person shut out from any discussion whatsoever was the one committee member, Professor Palmateer, who had challenged Dr. Dobrzykowski's question during Dr. Isabell's interview.

Despite the reality of the committee's concerns, Dr. Dobrzykowski represented to Dean Clark that the comparison table was "submitted on behalf of the committee" and went so far as to represent that the "committee would prefer to call a *fail search* if Ms. Gatto chose not to accept the position," telling Dean Clark that the committee was not only recommending Ms. Gatto but recommending that Dr. Isabell should not be hired if Ms. Gatto did not take the job. ECF 27-19 (emphasis added). On this record, both representations were not true. The committee had not even convened to discuss

strengths and weaknesses or these recommendations, much less determined that Dr. Isabell wasn't even worthy of hire in the event Ms. Gatto did not accept.

Dean Clark testified that she sometimes has followed committee recommendations and sometimes has declined to follow committee recommendations, but here she testified she relied on the recommendation, along with curricula vitae and her own interviews of the candidates. ECF 34-8 at 20-21, 76-77. Dean Clark opined that Ms. Gatto was the best candidate because she had "much more didactic classroom experience" (ECF 27-9 at 96), but no one has designated any evidence that Dean Clark would have made the same decision regardless of the recommendation. No one has designated any evidence that Dean Clark disregarded the recommendation. She relied on it in fact. On this record, a reasonable jury could find that Dr. Dobrzykowski's retaliatory animus tainted or influenced—indeed, caused—the decision to pass Dr. Isabell over for the position, and one for which Dr. Dobrzykowski could be held liable.

Indiana University bolsters its position with faculty reviews of the teaching presentations that both candidates performed. Those reviews seem almost entirely to favor Ms. Gatto, though the court needn't and shouldn't weight them. *Cf.* ECF 27-17 *with* 27-18. Based on this record, however, it does not seem that Dean Clark reviewed them for her decision (ECF 34-8 at 76-77); and the committee remains unsure of what its recommendation would have been even taking those into account. Those teaching evaluations thus may be important at trial, but they do not alter the triable issues that exist here. In the same vein, the student evaluations of Dr. Isabell's teaching, which in many cases gave her high marks, may be important at trial but don't alter the analysis here. This case is for the jury.

C.      *Pretext Presents a Triable Issue.*

Sufficient evidence of pretext exists even if Indiana University's decision, reasonably based on retaliatory animus from this record, might not have changed. "Often, the same evidence used to establish the *prima facie* case is sufficient to allow a jury to determine that a defendant's stated reason

for terminating a plaintiff was a mere front for an ulterior, unlawful motive." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 673 (7th Cir. 2009). Although the subject here is not tenure, the court still should not sit as an academic review board and question the judgment of faculty members about these types of hiring decisions. *See Haynes*, 902 F.3d at 734. Scholars, not courts, "are in the best position to make the highly subjective judgments related with the review of scholarship and university service." *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005).

The case of pretext here is not just a challenge to the accuracy of Indiana University's assessment. Indiana University claims that Dr. Dobrzykowski's additional questioning of Dr. Isabell was just "an error" (ECF 38 at 8), but a reasonable jury could reject this explanation based on university policy, the nature of the article, and nature of Dr. Dobrzykowski's questioning. Dr. Dobrzykowski denies she treated the candidates differently in questioning, but this record easily allows a reasonable jury to reject that claim, even to view it as dissembling. Dr. Dobrzykowski's unusual rush to a recommendation, her representations that the recommendation reflected the will of the search and screen committee when it did not, and the reasoned recognition of faculty that the process, even when completed, remained unfair cast the decision in reasonable pretext. Dr. Dobrzykowski's added "recommendation" that Dean Clark should even reject Dr. Isabell even if Ms. Gatto did not take the job—something the committee certainly had not discussed or recommended—draws seriously into question for a reasonable jury whether the ultimate decision based on this was thus infused with pretext rather than an honest assessment of academic caliber. *Gordon v. United Airlines, Inc.,* 246 F.3d 878, 889 (7th Cir. 2001) (court "need not abandon good reason and common sense in assessing an employer's actions").

For various reasons on this record, and again taking all inferences in Dr. Isabell's favor as the court must at this stage, summary judgment on the First Amendment retaliation claim is not appropriate.

      D.     *Indiana University Has Not Established a Right to Qualified Immunity on the First Amendment Retaliation Claim.*

Indiana University claims that the First Amendment retaliation claim against Dr. Dobrzykowski is barred by qualified immunity. Qualified immunity requires consideration of two factors: "(1) whether a constitutional right was violated using plaintiff's version of the facts, and (2) whether that right was clearly established at the time." *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011) (citations omitted); s*ee also White v. Pauly*, 137 S. Ct. 548, 551 (2017) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.") (citation omitted) (internal quotation marks omitted).

Indiana University has not argued that Dr. Isabell's right was not clearly established, nor could it. *See Kristofek v. Village of Orland Hills*, 832 F.3d 785, 789-90 (7th Cir. 2016). Instead, Indiana University contends that Dr. Isabell cannot on this record establish that her constitutional right was violated. For a number of reasons already given, the court does not agree. Summary judgment must be denied.

      E.     *The Eleventh Amendment Immunizes the Trustees of Indiana University From the Claim under Indiana's Conscience Statute.*

The second claim advanced by Dr. Isabell in response to summary judgment is against Indiana University for allegedly violating Indiana's Conscience Statute. ECF 34 at 2. The statute provides that "[n]o hospital or other person shall discriminate against or discipline a person because of the person's moral beliefs concerning abortion." Ind. Code § 16-34-1-6. A person whose right under this statute has been violated may commence "[a] civil action for damages." Ind. Code § 16-34-1-7. Indiana University in opening brief argued that the Indiana Tort Claims Act barred this claim because Dr. Isabell had not tendered the statutorily-required notice of her claim. Yet, Indiana University waived that defense, and wisely conceded this point in its reply brief. ECF 38 at 14.

In reserve, the university says the Eleventh Amendment bars this state law claim. *See Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 547-48 (2002) (affirming dismissal of state law claims based

on Eleventh Amendment). Dr. Isabell articulates no argument in briefing to oppose application of this immunity. When pressed on this issue by the court at the status conference setting trial, Dr. Isabell said she was seeking just injunctive and declaratory relief under this statute, not money damages. ECF 35, Tr. at 8. That claim nonetheless is barred by the Eleventh Amendment. *Seminole Tribe v. Florida,* 517 U.S. 44, 58 (1996), *superseded on other grounds, Cory v. White,* 457 U.S. 85, 90 (1982) ("It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgement is sought."); *Penhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100-101 (1984); *Kroll v. Brd. of Trustees of Univ. of Ill.,* 934 F.2d 904, 907 (7th Cir. 1991). Dr. Isabell offers no argument or authority to the contrary; nor does she explain how the state has waived this immunity by virtue of this statute or claim. Summary judgment is appropriate on this claim.

CONCLUSION

Accordingly, the court GRANTS the summary judgment motion on the remaining state law claim under the Indiana Conscience Statute and DENIES the motion as to the First Amendment retaliation claim. That said, the only defendant remaining is Dr. Teresa Dobrzykowski.

SO ORDERED.

January 7, 2020                           *s/ Damon R. Leichty*
                                          Judge, United States District Court